UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| Kenneth Nichols | : | PRISONER |
| | | 3:03CV0879(JBA) |
| v. | : | |
| Dr. E. Pesanti, et al | : | August 25, 2004 |

## AFFIDAVIT OF DR. EDWARD BLANCHETTE

I, Edward Blanchette, being duly sworn hereby depose and say:

1. I am a physician licensed to practice medicine in the State of Connecticut since 1975.

2. I completed my residency in Medicine at Saint Francis Hospital, Hartford, Connecticut in 1977, and completed a Fellowship in Infectious Disease and Microbiology from the University of Connecticut School of Medicine in 1979.

3. I have held various positions with the Connecticut Department of Correction since 1984, including Hospital Clinical Director at the Connecticut Correctional Institution in Somers, Connecticut, Acting Director of Health Services and Clinical Practice Coordinator, and the Medical Director at the MacDougall Correctional Institution (MCI) in Suffield, Connecticut, where my duties including providing direct patient care to inmates.

4. I am presently the Director of Clinical and Professional Services for the Department of Correction. Attached hereto is a copy of my curriculum vitae.

5. In 1995/1996, the State of Connecticut, Department of Correction contracted with the University of Connecticut Health Center to provide treatment to Connecticut prisoners through an organization developed as Correctional Managed Health Care (CMHC).

6. I am familiar with the policies and practices utilized by CMHC for the purpose of providing medical treatment to prisoners in the custody of the Connecticut Department of Correction (DOC).

7. Currently, medical treatment is available and provided to prisoners at the medical department of the prison facility in which the prisoner is housed.

8. If a prisoner requires medical treatment beyond that which is available at the particular prison facility, the prisoner can be transported to a different prison facility with the means to treat the prisoner.

9. If the prisoner requires medical treatment not available within the DOC prison facilities, themselves, the prisoner can be brought to the University of Connecticut Health Center (UCHC) for treatment.

10. I have reviewed the medical records of the plaintiff in this matter as well as an RT 60 screen indicating where the plaintiff was housed while in the custody of the Commissioner of Correction. It is my understanding that the plaintiff is complaining that he received inadequate medical care for a left inguinal hernia which was ultimately repaired by surgery on July 9, 2002 at the University of Connecticut Health Center in Farmington.

11. The plaintiff was incarcerated from September of 1994 until October of 1999. **RT 60.** He was not in custody from October of 1999 until August 30, 2000. **RT 60.** He was at Northern Correctional Institution (hereinafter "Northern") from September 2000 until March of 2002, and is still incarcerated. **RT 60.**

12. On March 6, 2001, the plaintiff was seen by an A.P.R.N. at Northern. **Medical Records p. 251.** On this date, the reason for plaintiff's visit was to be followed for ulcers in his mouth.

2

**Medical Records p. 250-51.** During that visit, the plaintiff also indicated that he had a hernia in his left groin that had been there for about 10 years. **Medical Records p. 251.**

13. On this date, the plaintiff complained that the hernia was painful. **Medical Records p. 251.** When evaluated for objective, however, the A.P.R.N. noted the following: "On inspection mass present … L [left] groin over L scrotum. Does not descend on cough, nor on repetition X 3 [three times]. Able to walk, get in & out of chair c-out [without] noted discomfort." **Medical Records p. 251.**

14. The A.P.R.N.'s assessment was "Hernia, not incarcerated." **Medical Records p. 251.** The A.P.R.N.'s plan for the patient was to refer him to Dr. Pillai for evaluation. **Medical Records p. 251.** The care the plaintiff received on this date was well within the standard of care given the plaintiff's symptoms.

15. Within four days of his visit with the A.P.R.N., the plaintiff was seen by Dr. Pillai. **Medical Records p. 251.** On April 10, 2001, the plaintiff did not complain of pain, but informed the doctor that he had "occasional constipation" with the hernia, which he had had for ten years. **Medical Records p. 251.**

16. Dr. Pillai noted that on examination the hernia was reducible. **Medical Records p. 251.** The doctor's plan for the patient at this time was "Reassurance, truss, colace, re-evaluate … 6 months." **Medical Records p. 251** The truss was appropriate in order to prevent the hernia from increasing. The colace was appropriate to relieve any diarrhea. An evaluation within 6 months was well within the standard of care given the plaintiff's symptoms.

17. The plaintiff alleges in his complaint that on May 21, 2001, Correctional Head Nurse Wollenhaupt informed him that hernia surgery was an elective procedure. While this

communication is not found in the medical records, any such communication is accurate and entirely consistent with the applicable standard of care.

18.     The plaintiff further alleges that he sent a letter to Pamela Shea on June 8, 2001, seeking surgery to repair his hernia. Ms. Shea is alleged to have informed the plaintiff on June 19, 2001, that he would be re-evaluated in 6 months, or sooner if his condition changed. Any such communication is entirely consistent with the applicable standard of care.

19.     On June 25, 2001, the next month, Dr. Wright saw the plaintiff regarding his hernia. Dr. Wright's note stated, in pertinent part:

> S [Symptoms]: PT [patient] 35 yo [year old] presents with Hx [history] of Inguinal with bulged [sic] . This he says is painful occasionally. PT says he doesn't have mass at this time. Everything is OK.
> O [Objective]:  Normal male genitalia. …No lesion or bulge palpated.
> A [Assessment]:     R/O [Rule-out] hernia groin L.
> P [Plan]:     PTR [patient to return] 2 wks. PT says occasionally mass comes through and he pushes up. Isn't wearing supportive gear. No lifting wts.

**Medical Records p. 250.**

20.     Dr. Wright's care on June 25, 2001 was entirely within the standard of care given the plaintiff's symptoms. The plaintiff had no palpable hernia at this time and was experiencing no pain at this time. The plaintiff was not wearing the truss Dr. Pillai had prescribed. He was advised not to lift weights.

21.     Dr. Wright again saw the plaintiff on July 14, 2001, less than a month later. At this time, Dr. Wright noted:

> PT not complaining of any herniated lesion. Will follow up any complaints.
> During exam didn't feel any lesion.

**Medical Records p. 249.**

22.     The plaintiff did not seek an appointment with medical staff about his hernia for the remainder of the time he spent at Northern, that is, for the next eight months through March 22,

2002.  **Medical Records.** The plaintiff did have numerous medical appointments between July 14, 2001 and March of 2002 that were completely unrelated to his hernia, at least 7 of them. **Medical Records**.  The plaintiff did not raise the issue of his hernia at any of these appointments.  **Medical Records**.

23. When the plaintiff was medically cleared to be transferred from Northern to MacDougall-Walker Correctional Institution (hereinafter "Mc-DW"), he raised health concerns completely unrelated to his hernia.  **Medical Records 243.**  He did not raise the hernia as an issue.  **Medical Records 243.**

24. Medical staff at Mc-DW saw the plaintiff the day after his transfer, on March 23, 2002. **Medical Records p. 242.**  At this time, the plaintiff did not raise the hernia as an issue.  **Medical Records 242.**

25. The next entry in the plaintiff's medical records regarding the hernia is dated April 18, 2002 and is made by Dr. Silvis:

> S: Comes down at Request of Asst. Atty. General—L Ing. Hernia/ since at least 2000.
> O: Truss given and did not fit.
> ABD [abdomen] = soft, + [positive] BS [bowel sounds], L inguinal hernia
> A: …L inguinal hernia.  Hernia (direct) Patient not aware of and chart does not show surgical repair.  >>> URC referral to surgery.  Also new order for Truss- larger size.

**Medical Records 60; see also 25.**

26. Prior to this note, there is no indication that the plaintiff ever complained that the truss given him previously did not fit.  On April 18, 2002, Dr. Silvis completed a URC request for surgery.  **Medical Records 9.**  His URC request was denied.  **Medical Records 8.**  URC's denial of the request for surgery was consistent with the standard of care, and did not constitute deliberate indifference.

5

27. On May 15, 2002, URC amended its response, approving a surgical consult at UCONN. **Medical Records 7.** On May 21, 2002, an outside surgeon approved the plaintiff for surgical repair, noting that the hernia was still "reducible." **Medical Records 4.** Surgery to repair the hernia was conducted on July 9, 2002. **Medical Records 28.** The patient was seen for appropriate follow-up care and the surgical wound healed well. **Medical Records 67, 66, 65.**

28. An inguinal hernia results from the abnormal passage of an internal abdominal organ or structure, typically an intestine, through the inguinal canal. In men, this results in a bulge in the scrotum. The bulge can vary in size, being very small or as big as a grapefruit. Inguinal hernias are quite common. Reducible inguinal hernias do not generally impact an individual's daily activities.

29. If the bulge caused by a hernia can be returned to its normal location by manipulation, the hernia is considered to be a reducible hernia. An easily reducible inguinal hernia such as the plaintiff experienced is not a medical emergency. An incarcerated bulge which cannot be returned to its normal location is considered a medical emergency. At no time did the plaintiff experience an incarcerated hernia.

30. Surgery to repair such a reducible inguinal hernia is considered elective. Patients in or out of a correctional facility can go for several years without corrective surgery and suffer no pain and no ill effects. Based on my training and experience as a doctor, having treated or overseen the treatment of dozens of patients with inguinal hernias, and based upon my review of the plaintiff's medical records, any claim the plaintiff in this case is making that he suffered pain from his hernia is not credible.

31.     There was nothing about the care provided to the plaintiff for his hernia while in the custody of the Connecticut Department of Correction which rises to the level of deliberate indifference.  Surgery to repair the plaintiff's hernia was never of an emergent nature.  State officials agreed to repair the hernia after the plaintiff brought a habeas corpus action in state court because there was time while the plaintiff was incarcerated and it was appropriate to repair the hernia at some point.

32.     The medically appropriate standard of care was met at all times with regard to the treatment of the plaintiff's inguinal hernia.  At no time did any of the defendants in this matter or any other medical personnel provide the plaintiff with anything but good medical care for his hernia.  At no time was the plaintiff suffering from any risk to his health or safety.

       /s/_____
Edward A. Blanchette

Subscribed and sworn to before me this 25th day of August, 2004.

  /s/_____
Lynn D. Wittenbrink
Commissioner of the Superior Court